## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PAOLO GUERRA, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:16-cv-10914 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ALBERT ERNST, CHRISTOPHER H. FRANKLIN, EDWARD G. JEPSEN, DAVE R. LOPEZ, HAZEL R. O'LEARY, THOMAS G. STEPHENS, G. BENNETT STEWART III, LEE C. STEWART, JOSEPH L. WELCH, ITC HOLDINGS CORP., FORTIS, INC., FORTIS US, ELEMENT ACQUISITION SUB INC. | |
| Defendants. | |

Plaintiff, by his attorneys, for his complaint against defendants, allege upon personal knowledge as to himself, and upon information and belief as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is a class action brought on behalf of the public shareholders of ITC Holdings Corporation ("ITC" or the "Company") to enjoin the acquisition of ITC's publicly owned shares by Fortis, Inc., through its wholly-owned U.S. subsidiaries, FortisUS, Inc. and Element Acquisition Sub Inc.[1] (collectively     "Fortis")   as   detailed   herein   ("Proposed Transaction").

---

[1]     Element Acquisition Sub, Inc. also may be referred to as "Merger Sub."

2.      On February 9, 2016, ITC and Fortis jointly announced that they had entered into a definitive agreement and plan of merger ("Merger Agreement") under which Fortis will acquire the stock of ITC in a transaction valued at approximately $11.3 billion.  Under the terms of the Merger Agreement, ITC shareholders will receive $22.57 in cash and 0.7520 shares of Fortis stock for each ITC share ("Merger Consideration") for a total per share Merger Consideration of $44.90 ("Proposed Transaction").

3.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties by, among other things, agreeing to sell to ITC without obtaining adequate, fair and maximum consideration under the circumstances. Indeed, Defendants failed to negotiate a collar on the stock portion of the proposed Merger Consideration which means the total consideration ITC shareholders receive is subject to Fortis' stock price performance. For example, after the Proposed Transaction was announced, Fortis' stock price dropped and the Merger Consideration also dropped by nearly $2.00. Further, the value of ITC shareholders' investment post merger will be diluted due to Fortis' financing arrangements –including increased debt and sell off of assets –  made to fund the Proposed Transaction.

4.      Moreover, the Board has exacerbated its breach of fiduciary duties by agreeing to lock up the Proposed Transaction with deal protective devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, in Sections 7.1 and 9.2 of the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision mandating that the Company must inform Fortis before taking action on any superior proposal from another potential acquirer, and requiring that the Board provide all information relating to the superior proposal (including the

terms and identity of the suitor), (iii) a provision that requires the Board to negotiate with Fortis so that it may match any competing and/or superior, and (iv) a provision that requires ITC to pay Fortis a significant termination fee of $245 million.

5. In pursuing the unlawful plan to facilitate the acquisition of ITC by Fortis for grossly inadequate consideration and through a flawed process, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing.

6. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties of loyalty, good faith, due care.

## JURISDICTION AND VENUE

7. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332. Plaintiff is a citizen of Italy while Defendants are all citizens of other states, and the amount in controversy exceeds $75,000. Indeed, the value of the Proposed Transaction is approximately $245 million.

8. The Court has personal jurisdiction over the Defendants as each either is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because ITC maintains its primary place of business in this District at 27175 Energy Way, Novi, Michigan 48377.

**THE PARTIES**

10.    Plaintiff Paolo Guerra is and was, at all times relevant hereto, a holder of ITC common stock.

11.    ITC Holdings Corporation is a Michigan corporation with its principal place of business located at 27175 Energy Way, Novi, Michigan 48377.  ITC engages in the transmission of electricity, functioning as conduit, allowing for power from generators to be transmitted to local distribution systems through its own systems or in conjunction with neighboring transmission systems. It owns and operates high-voltage transmission facilities in Michigan's Lower Peninsula and portions of Iowa, Minnesota, Illinois, Missouri, Kansas, and Oklahoma. The company serves investor-owned utilities, municipalities, cooperatives, power marketers, and alternative energy suppliers. The Company's stock trades under the symbol "ITC" on the New York Stock Exchange.   ITC  is named herein as a necessary party in connection with equitable relief needed to prevent the consummation of the Proposed Transaction being considered by its Board of Directors, the Individual Defendants herein, in violation of their fiduciary duties to Plaintiff and the other shareholders of ITC.

12.    Defendant Albert Ernst has served as a member of the Board of Directors since 2014, and is a member of the Audit & Finance, and Operations Committees.

4

13.     Defendant Christopher H. Franklin has served as a member of the Board of Directors since 2011, is a member of the Audit & Finance Commitee, and is Chair of the Operations Committee.

14.     Defendant Edward G. Jepsen has served as a member of the Board of Directors since 2005, and is Chair of the Audit & Finance Committee and a member of the Nominating and Governance Committee.

15.     Defendant Dave R. Lopez has served as a member of the Board of Directors since 2014, and is Chair of the Compensation Committee and a member of the Nominating & Governance Committee.

16.     Defendant Hazel R. O'leary has served as a member of the Board of Directors since 2007, and is Chair of the Nominating & Governance Committee and a member of the Compensation Committee.

17.     Defendant Thomas G. Stephens has served as a member of the Board of Directors since 2012, and is a member of the Compensation and Operations Committees.

18.     Defendant G. Bennett Stewart III has served as a member of the Board of Directors since 2006, and is a member of the Audit & Finance, and Nominating and Governance Committees.

19.     Defendant Lee C. Stewart has served as a member of the Board of Directors since2005, and is a member of the Audit & Finance, and Operations Committees.

20.     Joseph L. Welch currently is Chairman of the Board of Directors, President And Chief Executive Officer.  He has served as a member of the Board since 2003.

21.     The above ITC board members are referred to herein collectively as the "Individual Defendants."

22.     Defendant Fortis Inc. is a Canadian corporation and is the largest investor-owned gas and electric distribution utility in Canada.  Its regulated utilities account for 90% of total assets and serve more than 2.4 million customers across Canada, New York State, and the Carribean.  Fortis Inc.'s common shares trade on the Toronto Stock Exchange under the ticker symbol "FTS."

23.     Defendant FortisUS, is a Delaware Corporation is a wholly-owned subsidiary of Fortis, Inc.

24.     Defendant Element Acquisition Sub, Inc. Inc. is a corporation organized and existing under the laws of the state of Michigan for purposes of effecting the Proposed Transaction.

**THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

25.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public shareholders of ITC (the "Class") and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, and loyalty.

26.     By virtue of their positions as directors and/or officers of ITC, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause ITC to engage in the practices complained of herein.

6

27.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with due care, including reasonable inquiry.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision. To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

28.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of ITC, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the public shareholders of ITC common stock.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other shareholders of the Company (except the Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest), who are, or will be, threatened with injury arising from Defendants' actions, as more fully described herein.

30.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of October 30, 2015, there were approximately 153,418,988 million shares of ITC common stock issued and outstanding, likely owned by thousands of shareholders.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(c)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially members or impede their ability to protect their interests.

(d)     To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be

entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

31.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)     Whether the Individual Defendants have breached and are continuing to breach their fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     Whether ITC and the Individual Defendants have breached the fiduciary duties owed to Plaintiffs and members of the Class;

(c)     Whether the Proposed Transaction is entirely fair to Plaintiff and other members of the Class;

(d)     Whether Fortis aided and abetted in the breaches of fiduciary duty owed to Plaintiff and the Class; and

32.     Whether Plaintiff and the other members of the Class would suffer irreparable injury where the transaction complained of herein consummated.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

33.     According to ITC's SEC filings, its business consists primarily of the electric transmission operations through its "Regulated Operating Subsidiaries."[2]  In 2002, ITC was incorporated in the State of Michigan for the purpose of acquiring ITCTransmission. ITCTransmission was originally formed in 2001 as a subsidiary of DTE Electric, an electric

---

[2]     Form 10-k, filed February 26, 2015.

utility subsidiary of DTE Energy, and was acquired in 2003 by ITC Holdings. METC was originally formed in 2001 as a subsidiary of Consumers Energy, an electric and gas utility subsidiary of CMS Energy Corporation, and was acquired in 2006 by ITC Holdings. ITC Midwest was formed in 2007 by ITC to acquire the transmission assets of IP&L in December 2007. ITC Great Plains was formed in 2006 by ITC and became a FERC-jurisdictional[3] entity in 2009. The Company operates high-voltage systems in Michigan's Lower Peninsula and portions of Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma that transmits electricity from generating stations to local distribution facilities connected to our systems.

34.     The Company's strategy is to "operate, maintain and invest in transmission infrastructure in order to enhance system integrity and reliability, to reduce transmission constraints and to allow new generating resources to interconnect to our transmission systems." The Company also pursues development projects not within its existing systems, which are also intended to improve overall grid reliability, reduce transmission constraints and facilitate interconnections of new generating resources, as well as to enhance competitive wholesale electricity markets.

35.     ITC's Regulated Operating Subsidiaries earn revenues through tariff rates charged for the use of their electric transmission systems by customers, which include investor-owned utilities, municipalities, cooperatives, power marketers and alternative energy suppliers. As independent transmission companies, its Regulated Operating Subsidiaries are subject to rate regulation only by the FERC.[4] The rates charged by its Regulated Operating Subsidiaries are

---

[3]     FERC refers to the Federal Energy Regulatory Commission.
[4]     This generally equates to rates higher than those permitted by state regulatory bodies. Indeed, as provided in the joint press release announcing the Merger Agreement, "ITC's tariff rates are regulated by FERC, which has been one of the most consistently supportive utility regulators in North America providing reasonable returns and equity ratios. Rates are set using a

established using cost-based formula rate templates.

36.     The Company reported at the beginning of 2015 that its long-term growth plan included continued investment in current transmission systems, generator interconnections and our ongoing development projects.  Its Development Projections included the investment of approximately $1.1 billion from 2014 through 2018 to construct various development projects, or portions thereof, that are expected to result from the competitive process established pursuant to FERC Order No. 1000 ("Order 1000") and through other initiatives to upgrade the existing transmission grid and regional transmission facilities, primarily to improve overall grid reliability, reduce transmission constraints, enhance competitive markets and facilitate interconnections of new generating resources, including wind generation and other renewable resources necessary to achieve state and federal policy goals.

**B.     The Proposed Transaction is Announced**

37.     On February 9, 2016, ITC and Fortis issued a joint press release announcing the Proposed Transaction, which provided in relevant part:

St. John's, NL and Novi, Michigan (February 9, 2016):

### FORTIS INC. TO ACQUIRE ITC HOLDINGS CORP. FOR US$11.3 BILLION

*Fortis to increase its 2016 consolidated mid year rate base to approximately C$26 billion (US$18 billion) with acquisition of the largest independent transmission utility in the United States*

**<u>Highlights</u>**

· The acquisition aligns with Fortis' financial objectives by providing approximately 5% earnings per common share accretion in the first full year following closing, excluding one-time acquisition-related expenses. Fortis continues to target 6% average annual dividend growth through 2020.

forward-looking rate-setting mechanism with an annual true-up, which provides timely cost recovery and reduces regulatory lag."

11

- ITC owns and operates high-voltage transmission facilities in Michigan, Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma, serving a combined peak load exceeding 26,000 megawatts along approximately 15,600 miles of transmission line.
- Fortis will become one of the top 15 North American public utilities ranked by enterprise value.
- ITC's FERC regulated operations, with substantial rate base growth and robust investment opportunities, add a new growth platform.
- Following the acquisition, ITC will continue as a stand-alone transmission company, retaining its focus on growth and operational excellence while benefiting from a broader platform that will support its mission to modernize electrical infrastructure in the U.S.
- ITC's average rate base and CWIP is expected to grow at a compounded average annual rate of approximately 7.5% through 2018.
- Fortis intends on retaining all of ITC's employees and maintaining the corporate headquarters in Novi, Michigan.
- The per share consideration of cash and Fortis stock payable to ITC shareholders of US$44.90 represents a 33% premium to the unaffected closing share price on November 27, 2015 and a 37% premium to the 30-day average unaffected share price prior to November 27, 2015. Pro forma, upon closing of the transaction, ITC shareholders will own approximately 27% of the combined company and will receive a meaningful increase in their dividend per share.
- In connection with the acquisition, Fortis will apply to list its common shares on the NYSE.

Fortis Inc. ("Fortis") (TSX: FTS) and ITC Holdings Corp. ("ITC") (NYSE: ITC) announced today that they have entered into an agreement and plan of merger pursuant to which Fortis will acquire ITC in a transaction (the "Acquisition") valued at approximately US$11.3 billion. Under the terms of the transaction ITC shareholders will receive US$22.57 in cash and 0.7520 Fortis shares per ITC share. At yesterday's closing price for Fortis common shares and the US$/C$ exchange rate, the per share consideration represents a premium of 33% over ITC's unaffected closing share price on November 27, 2015 and a 37% premium to the unaffected average closing price over the 30 day period prior to November 27, 2015.

Following the Acquisition, Fortis will be one of the top 15 North American public utilities ranked by enterprise value, with an estimated enterprise value of C$42 billion (US$30 billion). On a *pro forma* basis, the consolidated mid year 2016 rate base of Fortis would increase by approximately C$8 billion (US$6 billion) to approximately C$26 billion (US$18 billion), as a result of the Acquisition.

"Fortis has grown its business through strategic acquisitions that have contributed to strong organic growth over the past decade. Our performance in 2015 is a clear demonstration of the success of this strategy," says Mr. Barry Perry, President and

Chief Executive Officer of Fortis. "The acquisition of ITC — a premier pure-play transmission utility — is a continuation of this growth strategy. ITC not only further strengthens and diversifies our business, but it also accelerates our growth."

Under the terms of the Acquisition, which has been approved by the boards of directors of both companies, ITC shareholders will receive approximately US$6.9 billion in Fortis common shares and cash at closing and Fortis will assume approximately US$4.4 billion of consolidated ITC indebtedness. Upon completion of the Acquisition, ITC will become a subsidiary of Fortis and approximately 27% of the common shares of Fortis will be held by ITC shareholders. Fortis will apply to list its common shares on the New York Stock Exchange ("NYSE") in connection with the Acquisition and will continue to have its shares listed on the Toronto Stock Exchange ("TSX").

"From the very beginning of ITC, we have been focused on creating meaningful value for all stakeholders, including customers, investors and employees, by becoming the leading electric transmission company in the U.S.," says Joseph L. Welch, Chairman, President and CEO of ITC. "Fortis is an outstanding company with a proven track record of successfully acquiring and managing U.S. based utilities in a decentralized manner. This transaction accomplishes our objectives by better positioning the company to have a higher level of focus on pursuing our long-term strategy of investing in transmission opportunities to improve reliability, expand access to power markets and allow new generating resources to interconnect to transmission systems and lower the overall cost of delivered energy for customers.

"I am forever grateful for the hard work of the ITC employees in building this great company and look forward to a bright future of continued operational excellence supported by the Fortis platform," says Mr. Welch. "We also very much appreciate the longstanding support of our investors who will receive an attractive premium for their investment and will also benefit from the opportunity to participate in the upside of the combination, including future value creation and a growing dividend program."

In addition to the necessary state approvals, the closing of the Acquisition is subject to ITC and Fortis shareholder approvals, the satisfaction of other customary closing conditions, and certain regulatory and federal approvals including, among others, those of the Federal Energy Regulatory Commission ("FERC"), the Committee on Foreign Investment in the United States, and the United States Federal Trade Commission/Department of Justice under the *Hart-Scott-Rodino Antitrust Improvement Act*. The closing of the Acquisition is expected to occur in late 2016.

38.     The consideration offered to ITC public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of ITC common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.   The Proposed Transaction will deny Class members their right to share equitably in the true value of the Company.   Indeed, the benefits obtained by Fortis far outweigh those provided in the Merger Consideration.[5]   As a result, the Individual Defendants breached the fiduciary duties they owe to the Company's public shareholders because those shareholders will not receive adequate or fair value for their Company common stock in the Proposed Transaction.

39.     Based on the aforementioned, the Proposed Transaction is wrongful, unfair and harmful to ITC public shareholders because they will not be able to see a fair return on ITC strong potential for future growth. The Proposed Transaction represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members by denying Class members their right to share proportionately and equitably in the true value of the Company.

40.     The failure of the Individual Defendants to secure an adequate price is apparent from the $44.90 per share consideration to which the Individual Defendants agreed. ITC, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

41.     ITC has a demonstrated history of strong financial performance and significant upward potential moving forward.

---

[5]     In connection with the Proposed Transaction, Fortis will become a registrant with the SEC and its stock will trade on the New York Stock Exchange.

42.     In its third quarter and year-to-date earnings release on November 5, 2015, the Company reported the following: (i) for the nine months ended September 30, 2015, net income was $205.0 million, or $1.31 per diluted common share, compared to $197.3 million, or $1.25 per diluted common share for the same period last year; (ii) operating earnings for the third quarter were $82.3 million, or $0.53 per diluted common share, compared to operating earnings of $73.7 million, or $0.47 per diluted common share for the third quarter of 2014. For the nine months ended September 30, 2015, operating earnings were $236.2 million, or $1.51 per diluted common share, compared to operating earnings of $216.1 million, or $1.36 per diluted common share for the same period last year; and (iii) operating earnings for the third quarter and nine month period ended September 30, 2015 increased by $8.6 million, or $0.06 per diluted common share, and $20.1 million, or $0.15 per diluted common share, compared with the same period last year.[6]

43.     ITC is revised 2015 capital guidance range to a range of $715 to $765 million from the previous range of $710 to $810 million. The revised range includes $180 to $190 million for ITC*Transmission*, $155 to $170 million for METC, $370 to $385 million for ITC Midwest, $10 to $15 million for ITC Great Plains and up to $5 million of Development and Other.

44.     The Individual Defendant, Board chairman, CEO and president of ITC, Joseph L. Welch ("Welch") characterized these results positively:

---

[6]     ITC's operating revenues for the third quarter of 2015 increased to $299.8 million compared to $270.1 million for the third quarter of 2014. The increase was primarily due to higher revenue requirements attributable to a higher rate base at the Company's regulated operating subsidiaries, as well as an increase in regional cost sharing revenues resulting from additional capital projects being placed in-service that have been identified by MISO as eligible for regional cost sharing.

During the third quarter, we continued to execute on our strategy to invest in critical transmission infrastructure, including base and regional capital, while delivering operational excellence at all of our operating companies… We also remain focused on prudent value return as evidenced by the 15% dividend increase this quarter as well as the $115 million accelerated share repurchase program that will be completed by the end of the year.

45.     The second quarter results also reflected a positive trend in the Company's operations.  Thus, on July 30, 2015, for the second quarter 2015, ITC reported: (i)  net income was $72.3 million, or $0.46 per diluted common share, compared to $54.3 million or $0.34 per diluted common share for the second quarter of 2014. For the six months ended June 30, 2015, net income was $139.5 million, or $0.89 per diluted common share, compared to $123.5 million, or $0.78 per diluted common share for the same period last year; (ii) operating earnings for the second quarter were $80.8 million, or $0.52 per diluted common share, compared to operating earnings of $72.7 million, or $0.46 per diluted common share for the second quarter of 2014. For the six months ended June 30, 2015, operating earnings were $153.9 million, or $0.98 per diluted common share, compared to operating earnings of $142.5 million, or $0.90 per diluted common share for the same period last year.

46.     Welch was positive about the results and the future of the Company's operations:

We are pleased to report another strong quarter in which we met our operational and financial targets …During the second quarter, we completed the largest project in ITC's history, the Thumb Loop project at ITC*Transmission* ahead of schedule and under budget, while also delivering operational excellence to our customers and superior growth to our shareholders.

47.     The first quarter results similarly reflected growth and future positive results for Company shareholders: (i) net income of $67.1 million, or $0.43 per diluted common share, compared to $69.1 million or $0.43 per diluted common share for the first quarter of 2014; (ii) operating earnings for the first quarter of $73.1 million, or $0.47 per diluted common share,

compared to operating earnings of $69.8 million, or $0.44 per diluted common share for the first quarter of 2014.

48.     Welch's view was very positive for the start of the year:

We had a solid start to 2015 and made good progress with our plans … I am pleased with the performance and resiliency of our systems given the severe weather conditions experienced in our regions in the first quarter. Our efforts in the first quarter position us well to achieve our operational and financial objectives for the year.

49.     Despite such substantial benefits Fortis will obtain from the Proposed Transaction and ITC's steady growth over the last 12 months,  Defendants have agreed on Merger Consideration that is wholly inadequate and fails to reflect the intrinsic value of the Company. Indeed, the stock portion of the Merger Consideration is not subject to a collar provision to protect against the fluctuations in the trading price of Fortis stock.

50.     While ITC's public shareholders will be harmed from the Proposed Transaction, certain Defendants stand to receive a financial windfall they would not otherwise enjoy if the Company were to remain a standalone entity.   Pursuant to the Merger Agreement, the Company's restricted shares will no longer be subject to their restrictions and will become fully redeemable upon consummation of the Proposed Transaction.  Each of the Individual Defendants have substantial equity holdings in the Company (in excess of 3% of the outstanding equity) in the form of restricted shares and other forms of equity holdings.  The Proposed Transaction will provide the substantial benefit to the Individual Defendants to liquidate their otherwise illiquid holdings – a benefit not available to the Class.[7]   Additionally, ITC upper management and certain Individual Defendants will remain with the combined company and continue to receive lucrative compensation benefits.

---

[7]     Merger Agreement, Section 2.2, Exhibit 2.1 filed February 11, 2016 with SEC.

17

C.       **The Preclusive Deal Protection Devices**

51.      In addition to the woefully inadequate consideration offered to ITC shareholders, the entire process deployed by the ITC Board is also unfair and inadequate.  Namely, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

52.      First, the Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations.   The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations. Section 7.1(a) no solicitation provision provides that neither the Company nor anyone on its behalf may solicit, initiate, facilitate or encourage alternative proposals in an attempt to procure a price in excess of the amount offered by Fortis ("Acquisition Proposal").  This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors.

53.      The Merger Agreement at section 7.1(a) also requires the Company to notify Fortis of certain unsolicited competing offers and to provide Fortis with information regarding such Acquisition Proposals within 24 hours.

54.      Pursuant to §7.2(d) of the Merger Agreement, the Board may not recommend against the Proposed Transaction unless it gives Fortis notice and all information concerning a superior proposal and a three (3) business day period after the delivery of the notice during

which it must negotiate with Fortis so that Fortis has the opportunity to adjust the terms and conditions of the Merger Agreement so that the competing proposal ceases to be a superior proposal.  Accordingly, the Merger Agreement unfairly assures that any "auction" will favor Fortis and piggy-back upon the due diligence of the foreclosed alternative bidder.

55.     In addition, Section 9.2(b) of the Merger Agreement provides that ITC must pay to Fortis a termination fee of  up to $245 million if the Company decides to pursue another offer, thereby essentially requiring that any alternate bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer

56.     As a result of these provisions, even if a competing bidder were inclined to pay $245 million for the privilege of bidding on ITC, it would be faced with two additional hurdles: (1) negotiations with a Board that chose to enter into a Merger Agreement with Fortis; and (2) a material informational and negotiating disadvantage, as the specifics of its bid would be relayed to Fortis in real time, while any matching or topping bid by Fortis would not be reciprocally relayed back to it.  In other words, in addition to paying the termination fee just to bid on ITC, any such competing bidder would be required to bid in the dark and against itself.

57.     These provisions and agreements are unreasonable and unlawful will cumulatively discourage other potential bidders from making a competing bid for the Company.  Similarly, these provisions and agreements make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares

## COUNT I

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

58.     Plaintiff repeats and realleges each and every allegation set forth herein.

59.     The Individual Defendants have violated fiduciary duties of care, loyalty, and good faith owed to public shareholders of ITC.

60.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in ITC.

61.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of ITC because, among other reasons, they failed to take steps to maximize the value of ITC to its public shareholders.

62.     The Individual Defendants dominate and control the business and corporate affairs of ITC, and are in possession of private corporate information concerning ITC assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of ITC which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

63.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

64.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ITC assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

65.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

66.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## COUNT II

### Claim For Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty

67.     Plaintiff repeats and realleges each and every allegation set forth herein.

68.     Fortis and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to ITC public shareholders, and have participated in such breaches of fiduciary duties

69.     Fortis and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Fortis and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

70.     Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor and in favor of the Class, and against the Defendants as follows:

A.     Certifying this case as a class action, certifying Plaintiff as class representative and their counsel as class counsel;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a transaction providing the best possible terms for shareholders;

C.      Directing the Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of ITC shareholders;

D.      Enjoining Defendants from consummating the Proposed Transaction unless and until all material disclosures are made to ITC shareholders;

E.      Awarding Plaintiff and the Class appropriate compensatory damages;

F.      Awarding Plaintiff the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

G.      Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

Dated: March 14, 2016

**ANTHONY L. DELUCA, PLC**

By: ___/s/ Anthony DeLuca_____
    Anthony L. Deluca, Esq.
14950 East Jefferson Ave., Suite 170
Grosse Pointe Park, MI 48230
Tel:  (313) 821-5905
Fax: (313) 821-5906
Anthony@aldplc.com

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331