**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| PAOLO GUERRA, Individually and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br>    v.<br><br>ALBERT ERNST, CHRISTOPHER H. FRANKLIN, EDWARD G. JEPSEN, DAVE R. LOPEZ, HAZEL R. O'LEARY, THOMAS G. STEPHENS, G. BENNETT STEWART III, LEE C. STEWART, JOSEPH L. WELCH, and ITC HOLDINGS CORP.<br><br>                      Defendants. | No. 2:16-cv-10914-GCS-DRG<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Paolo Guerra, by his attorneys, for his complaint against Defendants, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.     This is a class action brought on behalf of the public shareholders of ITC Holdings Corporation ("ITC" or the "Company") against the Company and its Board of Directors (the "Board") for (i) violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, and (ii) the ITC Board of Director's breaches of fiduciary duties, in connection with the proposed acquisition of ITC's publicly owned shares by Fortis, Inc., through its wholly-owned U.S. subsidiaries,

FortisUS, Inc. and Element Acquisition Sub Inc.[1] (collectively "Fortis") as detailed herein ("Proposed Transaction").

2.      On February 9, 2016, ITC and Fortis jointly announced that they had entered into a definitive agreement and plan of merger ("Merger Agreement") under which Fortis will acquire the stock of ITC in a transaction valued at approximately $11.3 billion. Under the terms of the Merger Agreement, ITC shareholders will receive $22.57 in cash and 0.7520 shares of Fortis stock for each ITC share ("Merger Consideration") for a total per share Merger Consideration of $44.90 ("Proposed Transaction"). Following consummation of the Proposed Transaction, ITC will become a subsidiary of Fortis, with ITC shareholders owning approximately 27% of Fortis' common shares.

3.      In approving the Proposed Transaction, the Individual Defendants (defined below) have breached their fiduciary duties by, among other things, improperly agreeing to the acquisition by Fortis without obtaining adequate, fair and maximum consideration under the circumstances. Indeed, Defendants failed to negotiate a collar on the stock portion of the proposed Merger Consideration which means the total consideration ITC shareholders receive is subject to Fortis' stock price performance. For example, after the Proposed Transaction was announced, Fortis' stock price dropped and the Merger Consideration also dropped by nearly $2.00. As of March 22, 2016, based on Fortis' stock price and currency exchange rate the dollar value of the stock portion of the Merger Consideration is $22.95, for a total consideration of $42.65, a dramatic drop from the total value of over $53.00 when the Proposed Transaction was announced. Further, the value of ITC shareholders' investment post-merger is illusory as their

---

[1]      Element Acquisition Sub, Inc. also may be referred to as "Merger Sub."

shares will be diluted due to Fortis' financing arrangements –including increased debt and sell off of 19.9% of ITC to minority investors  –  made to fund the Proposed Transaction.

4.      Moreover, the Board exacerbated its breaches by locking up the Proposed Transaction with deal protective devices that preclude other bidders from making a successful competing offer for the Company.   Specifically, in Sections 7.1 and 9.2 of the Merger Agreement, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) a provision mandating that the Company must inform Fortis before taking action on any superior proposal from another potential acquirer, and requiring that the Board provide all information relating to the superior proposal (including the terms and identity of the suitor), (iii) a provision that requires the Board to negotiate with Fortis so that it may match any competing and/or superior, and  (iv) a provision that requires ITC to pay Fortis a significant termination fee of $245 million. These deal provisions, together with the 3.3% ownership interest of outstanding stock held by officers and management who have agreed to support the Proposed Transaction, ensure that Merger will be consummated.

5.      In pursuing the unlawful plan to facilitate the acquisition of ITC by Fortis for grossly inadequate consideration and through a flawed process, each of the Defendants violated applicable law by directly breaching and/or aiding the other Defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing.

6.      Further, in pursuing the unlawful plan to facilitate the acquisition of ITC by Fortis for grossly inadequate consideration and through a flawed process, Defendants violated Sections 14(a) and 20(a) of the Exchange Act by causing a materially incomplete and misleading Form F-4 Registration/Joint Proxy Statement ("F-4") to be filed with the U.S. Securities and Exchange

Commission ("SEC") on March 17, 2016.  The F-4 recommends that ITCs shareholders vote in favor of the Proposed Transaction based on misleading and/or omitted material information that renders the F-4 misleading.

7.      Specifically, the F-4 contains materially incomplete and misleading information concerning (i) the background of the Proposed Transaction; (ii) the Company's and Fortis' internal financial forecasts relied on by the Board and financial advisors; and (iii) the financial analyses of the Proposed Transaction performed by ITC's  and the Board's financial advisors.

8.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties of loyalty, good faith, due care.

## JURISDICTION AND VENUE

9.      Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  17 C.F.R. § 240.14a-9.

10.      The Court has personal jurisdiction over the Defendants as each either is organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because ITC maintains its primary place of business in this District at 27175 Energy Way, Novi, Michigan 48377.

## THE PARTIES

12.    Plaintiff Paolo Guerra is and was, at all times relevant hereto, a holder of ITC common stock.

13.    Defendant ITC Holdings Corporation is a Michigan corporation with its principal place of business located at 27175 Energy Way, Novi, Michigan 48377.  ITC engages in the transmission of electricity, functioning as conduit, allowing for power from generators to be transmitted to local distribution systems through its own systems or in conjunction with neighboring transmission systems. It owns and operates high-voltage transmission facilities in Michigan's Lower Peninsula and portions of Iowa, Minnesota, Illinois, Missouri, Kansas, and Oklahoma. The company serves investor-owned utilities, municipalities, cooperatives, power marketers, and alternative energy suppliers. The Company's stock trades under the symbol "ITC" on the New York Stock Exchange.

14.    Defendant Albert Ernst has served as a member of the Board of Directors since 2014, and is a member of the Audit & Finance, and Operations Committees.

15.    Defendant Christopher H. Franklin has served as a member of the Board of Directors since 2011, is a member of the Audit & Finance Committee, and is Chair of the Operations Committee.

16.     Defendant Edward G. Jepsen has served as a member of the Board of Directors since 2005, and is Chair of the Audit & Finance Committee and a member of the Nominating and Governance Committee.

17.     Defendant Dave R. Lopez has served as a member of the Board of Directors since 2014, and is Chair of the Compensation Committee and a member of the Nominating & Governance Committee.

18.     Defendant Hazel R. O'leary has served as a member of the Board of Directors since 2007, and is Chair of the Nominating & Governance Committee and a member of the Compensation Committee.

19.     Defendant Thomas G. Stephens has served as a member of the Board of Directors since 2012, and is a member of the Compensation and Operations Committees.

20.     Defendant G. Bennett Stewart III has served as a member of the Board of Directors since 2006, and is a member of the Audit & Finance, and Nominating and Governance Committees.

21.     Defendant Lee C. Stewart has served as a member of the Board of Directors since2005, and is a member of the Audit & Finance, and Operations Committees.

22.     Joseph L. Welch currently is Chairman of the Board of Directors, President And Chief Executive Officer.  He has served as a member of the Board since 2003.

23.     The above ITC Board members are referred to herein collectively as the "Individual Defendants."

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

24.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public shareholders of ITC (the "Class") and owe Plaintiff and the other members of the Class the duties of good faith, fair dealing, and loyalty.

25.     By virtue of their positions as directors and/or officers of ITC, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause ITC to engage in the practices complained of herein.

26.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with due care, including reasonable inquiry.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision. To diligently comply with this duty, the directors of a corporation may not take any action that:

        (a)     adversely affects the value provided to the corporation's shareholders;

        (b)     contractually prohibits them from complying with or carrying out their fiduciary duties;

        (c)     discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

        (d)     will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

27.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of ITC, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the public shareholders of ITC common stock.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other shareholders of the Company (except the Defendants herein and any persons, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest), who are, or will be, threatened with injury arising from Defendants' actions, as more fully described herein.

29.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of October 30, 2015, there were approximately 153,418,988 million shares of ITC common stock issued and outstanding, likely owned by thousands of shareholders.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(c)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members

of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially members or impede their ability to protect their interests.

(d)     To the extent Defendants take further steps to effectuate the Proposed Transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

30.     There are questions of law and fact that are common to the Class and that predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)     Whether Defendants have violated Section 14(a) of the Exchange act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were they required to vote on the Merger without receiving the material information referenced above and the Proposed Transaction is consummated as presently anticipated.

31.     Whether Plaintiff and the other members of the Class would suffer irreparable injury where the transaction complained of herein consummated.

## SUBSTANTIVE ALLEGATIONS

**A.    Background**

32.     According to ITC's SEC filings, its business consists primarily of the electric transmission operations through its "Regulated Operating Subsidiaries."[2]   In 2002, ITC was incorporated in the State of Michigan for the purpose of acquiring ITCTransmission. ITCTransmission was originally formed in 2001 as a subsidiary of DTE Electric, an electric utility subsidiary of DTE Energy, and was acquired in 2003 by ITC Holdings. METC was originally formed in 2001 as a subsidiary of Consumers Energy, an electric and gas utility subsidiary of CMS Energy Corporation, and was acquired in 2006 by ITC Holdings. ITC Midwest was formed in 2007 by ITC to acquire the transmission assets of IP&L in December 2007.  ITC Great Plains was formed in 2006 by ITC and became a FERC-jurisdictional[3] entity in 2009.  The Company operates high-voltage systems in Michigan's Lower Peninsula and portions of Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma that transmits electricity from generating stations to local distribution facilities connected to our systems.

33.     The Company's strategy is to "operate, maintain and invest in transmission infrastructure in order to enhance system integrity and reliability, to reduce transmission constraints and to allow new generating resources to interconnect to our transmission systems." The Company also pursues development projects not within its existing systems, which are also intended to improve overall grid reliability, reduce transmission constraints and facilitate interconnections of new generating resources, as well as to enhance competitive wholesale electricity markets.

34.     ITC's Regulated Operating Subsidiaries earn revenues through tariff rates charged

---

[2]     Form 10-k, filed February 26, 2015.
[3]     FERC refers to the Federal Energy Regulatory Commission.

for the use of their electric transmission systems by customers, which include investor-owned utilities, municipalities, cooperatives, power marketers and alternative energy suppliers. As independent transmission companies, its Regulated Operating Subsidiaries are subject to rate regulation only by the FERC.[4] The rates charged by its Regulated Operating Subsidiaries are established using cost-based formula rate templates.

35.     The Company reported at the beginning of 2015 that its long-term growth plan included continued investment in current transmission systems, generator interconnections and our ongoing development projects.  Its Development Projections included the investment of approximately $1.1 billion from 2014 through 2018 to construct various development projects, or portions thereof, that are expected to result from the competitive process established pursuant to FERC Order No. 1000 ("Order 1000") and through other initiatives to upgrade the existing transmission grid and regional transmission facilities, primarily to improve overall grid reliability, reduce transmission constraints, enhance competitive markets and facilitate interconnections of new generating resources, including wind generation and other renewable resources necessary to achieve state and federal policy goals.

**B.     The Proposed Transaction is Announced**

36.     On February 9, 2016, ITC and Fortis issued a joint press release announcing the Proposed Transaction, which provided in relevant part:

St. John's, NL and Novi, Michigan (February 9, 2016):

---

[4]     This generally equates to rates higher than those permitted by state regulatory bodies. Indeed, as provided in the joint press release announcing the Merger Agreement, "ITC's tariff rates are regulated by FERC, which has been one of the most consistently supportive utility regulators in North America providing reasonable returns and equity ratios. Rates are set using a forward-looking rate-setting mechanism with an annual true-up, which provides timely cost recovery and reduces regulatory lag."

## FORTIS INC. TO ACQUIRE ITC HOLDINGS CORP. FOR US$11.3 BILLION

*Fortis to increase its 2016 consolidated mid year rate base to approximately C$26 billion (US$18 billion) with acquisition of the largest independent transmission utility in the United States*

### Highlights

- The acquisition aligns with Fortis' financial objectives by providing approximately 5% earnings per common share accretion in the first full year following closing, excluding one-time acquisition-related expenses. Fortis continues to target 6% average annual dividend growth through 2020.
- ITC owns and operates high-voltage transmission facilities in Michigan, Iowa, Minnesota, Illinois, Missouri, Kansas and Oklahoma, serving a combined peak load exceeding 26,000 megawatts along approximately 15,600 miles of transmission line.
- Fortis will become one of the top 15 North American public utilities ranked by enterprise value.
- ITC's FERC regulated operations, with substantial rate base growth and robust investment opportunities, add a new growth platform.
- Following the acquisition, ITC will continue as a stand-alone transmission company, retaining its focus on growth and operational excellence while benefiting from a broader platform that will support its mission to modernize electrical infrastructure in the U.S.
- ITC's average rate base and CWIP is expected to grow at a compounded average annual rate of approximately 7.5% through 2018.
- Fortis intends on retaining all of ITC's employees and maintaining the corporate headquarters in Novi, Michigan.
- The per share consideration of cash and Fortis stock payable to ITC shareholders of US$44.90 represents a 33% premium to the unaffected closing share price on November 27, 2015 and a 37% premium to the 30-day average unaffected share price prior to November 27, 2015. Pro forma, upon closing of the transaction, ITC shareholders will own approximately 27% of the combined company and will receive a meaningful increase in their dividend per share.
- In connection with the acquisition, Fortis will apply to list its common shares on the NYSE.

Fortis Inc. ("Fortis") (TSX: FTS) and ITC Holdings Corp. ("ITC") (NYSE: ITC) announced today that they have entered into an agreement and plan of merger pursuant to which Fortis will acquire ITC in a transaction (the "Acquisition") valued at approximately US$11.3 billion. Under the terms of the transaction ITC shareholders will receive US$22.57 in cash and 0.7520 Fortis shares per ITC share. At yesterday's closing price for Fortis common shares and the US$/C$

exchange rate, the per share consideration represents a premium of 33% over ITC's unaffected closing share price on November 27, 2015 and a 37% premium to the unaffected average closing price over the 30 day period prior to November 27, 2015.

Following the Acquisition, Fortis will be one of the top 15 North American public utilities ranked by enterprise value, with an estimated enterprise value of C$42 billion (US$30 billion). On a *pro forma* basis, the consolidated mid year 2016 rate base of Fortis would increase by approximately C$8 billion (US$6 billion) to approximately C$26 billion (US$18 billion), as a result of the Acquisition.

"Fortis has grown its business through strategic acquisitions that have contributed to strong organic growth over the past decade. Our performance in 2015 is a clear demonstration of the success of this strategy," says Mr. Barry Perry, President and Chief Executive Officer of Fortis. "The acquisition of ITC — a premier pure-play transmission utility — is a continuation of this growth strategy. ITC not only further strengthens and diversifies our business, but it also accelerates our growth."

Under the terms of the Acquisition, which has been approved by the boards of directors of both companies, ITC shareholders will receive approximately US$6.9 billion in Fortis common shares and cash at closing and Fortis will assume approximately US$4.4 billion of consolidated ITC indebtedness. Upon completion of the Acquisition, ITC will become a subsidiary of Fortis and approximately 27% of the common shares of Fortis will be held by ITC shareholders. Fortis will apply to list its common shares on the New York Stock Exchange ("NYSE") in connection with the Acquisition and will continue to have its shares listed on the Toronto Stock Exchange ("TSX").

"From the very beginning of ITC, we have been focused on creating meaningful value for all stakeholders, including customers, investors and employees, by becoming the leading electric transmission company in the U.S.," says Joseph L. Welch, Chairman, President and CEO of ITC. "Fortis is an outstanding company with a proven track record of successfully acquiring and managing U.S. based utilities in a decentralized manner. This transaction accomplishes our objectives by better positioning the company to have a higher level of focus on pursuing our long-term strategy of investing in transmission opportunities to improve reliability, expand access to power markets and allow new generating resources to interconnect to transmission systems and lower the overall cost of delivered energy for customers.

"I am forever grateful for the hard work of the ITC employees in building this great company and look forward to a bright future of continued operational excellence supported by the Fortis platform," says Mr. Welch. "We also very much appreciate the longstanding support of our investors who will receive an

attractive premium for their investment and will also benefit from the opportunity to participate in the upside of the combination, including future value creation and a growing dividend program."

In addition to the necessary state approvals, the closing of the Acquisition is subject to ITC and Fortis shareholder approvals, the satisfaction of other customary closing conditions, and certain regulatory and federal approvals including, among others, those of the Federal Energy Regulatory Commission ("FERC"), the Committee on Foreign Investment in the United States, and the United States Federal Trade Commission/Department of Justice under the *Hart-Scott-Rodino Antitrust Improvement Act*. The closing of the Acquisition is expected to occur in late 2016.

37.    The consideration offered to ITC public shareholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of ITC common stock is materially in excess of the amount offered for those securities in the proposed acquisition given the Company's prospects for future growth and earnings.   The Proposed Transaction will deny Class members their right to share equitably in the true value of the Company.   ITC, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction. Indeed, the benefits obtained by Fortis far outweigh those provided in the Merger Consideration.[5]

38.    Indeed, the Proposed Transaction represents an effort by Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members by denying Class members their right to share proportionately and equitably in the true value of the Company. Welch and other Individual Defendants, who with other senior officers, own 3.3% of the Company drove this process to ensure a sale to Fortis so that they could liquidate their otherwise illiquid equity holdings in ITC through the provisions in the Merger Agreement that accelerate and otherwise cash out restricted equity interests (e.g.,

---

[5]    In connection with the Proposed Transaction, Fortis will become a registrant with the SEC and its stock will trade on the New York Stock Exchange.

unvested options and restricted stock units). The payments that these individuals will receive, but not the public shareholders, total millions of dollars. Further, certain senior management and Individual Defendants will, on information and belief, remain with the combined company and receive additional lucrative compensation packages.

39.     ITC has a demonstrated history of strong financial performance and significant upward potential moving forward and should have brought a much higher consideration for ITC shareholders.

40.     In its third quarter and year-to-date earnings release on November 5, 2015, the Company  reported the following: (i) for the nine months ended September 30, 2015, net income was $205.0 million, or $1.31 per diluted common share, compared to $197.3 million, or $1.25 per diluted common share for the same period last year; (ii) operating earnings for the third quarter were $82.3 million, or $0.53 per diluted common share, compared to operating earnings of $73.7 million, or $0.47 per diluted common share for the third quarter of 2014. For the nine months ended September 30, 2015, operating earnings were $236.2 million, or $1.51 per diluted common share, compared to operating earnings of $216.1 million, or $1.36 per diluted common share for the same period last year; and (iii) operating earnings for the third quarter and nine month period ended September 30, 2015 increased by $8.6 million, or $0.06 per diluted common share, and $20.1 million, or $0.15 per diluted common share, compared with the same period last year.[6]

---

[6]     ITC's operating revenues for the third quarter of 2015 increased to $299.8 million compared to $270.1 million for the third quarter of 2014. The increase was primarily due to higher revenue requirements attributable to a higher rate base at the Company's regulated operating subsidiaries, as well as an increase in regional cost sharing revenues resulting from additional capital projects being placed in-service that have been identified by MISO as eligible for regional cost sharing.

41.    ITC is revised 2015 capital guidance range to a range of $715 to $765 million from the previous range of $710 to $810 million. The revised range includes $180 to $190 million for ITC*Transmission*, $155 to $170 million for METC, $370 to $385 million for ITC Midwest, $10 to $15 million for ITC Great Plains and up to $5 million of Development and Other.

42.    The Individual Defendant, Board chairman, CEO and president of ITC, Joseph L. Welch ("Welch") characterized these results positively:

> During the third quarter, we continued to execute on our strategy to invest in critical transmission infrastructure, including base and regional capital, while delivering operational excellence at all of our operating companies… We also remain focused on prudent value return as evidenced by the 15% dividend increase this quarter as well as the $115 million accelerated share repurchase program that will be completed by the end of the year.

43.    The second quarter results also reflected a positive trend in the Company's operations.  Thus, on July 30, 2015, for the second quarter 2015, ITC reported: (i)  net income was $72.3 million, or $0.46 per diluted common share, compared to $54.3 million or $0.34 per diluted common share for the second quarter of 2014. For the six months ended June 30, 2015, net income was $139.5 million, or $0.89 per diluted common share, compared to $123.5 million, or $0.78 per diluted common share for the same period last year; (ii) operating earnings for the second quarter were $80.8 million, or $0.52 per diluted common share, compared to operating earnings of $72.7 million, or $0.46 per diluted common share for the second quarter of 2014. For the six months ended June 30, 2015, operating earnings were $153.9 million, or $0.98 per diluted common share, compared to operating earnings of $142.5 million, or $0.90 per diluted common share for the same period last year.

44.    Welch was positive about the results and the future of the Company's operations:

> We are pleased to report another strong quarter in which we met our operational and financial targets …During the second quarter, we completed the largest project in ITC's history, the Thumb Loop project at ITC*Transmission* ahead of schedule and under budget, while also delivering operational excellence to our customers and superior growth to our shareholders.

45.     The first quarter results similarly reflected growth and future positive results for Company shareholders: (i) net income of $67.1 million, or $0.43 per diluted common share, compared to $69.1 million or $0.43 per diluted common share for the first quarter of 2014; (ii) operating earnings for the first quarter of $73.1 million, or $0.47 per diluted common share, compared to operating earnings of $69.8 million, or $0.44 per diluted common share for the first quarter of 2014.

46.     Welch's view was very positive for the start of the year:

> We had a solid start to 2015 and made good progress with our plans … I am pleased with the performance and resiliency of our systems given the severe weather conditions experienced in our regions in the first quarter. Our efforts in the first quarter position us well to achieve our operational and financial objectives for the year.

47.     Despite such substantial benefits Fortis will obtain from the Proposed Transaction and ITC's steady growth over the last 12 months, Defendants agreed on Merger Consideration that is wholly inadequate and fails to reflect the intrinsic value of the Company. Indeed, the stock portion of the Merger Consideration is not subject to a collar provision to protect against the fluctuations in the trading price of Fortis stock.

48.     While ITC's public shareholders will be harmed from the Proposed Transaction, certain Defendants stand to receive a financial windfall they would not otherwise enjoy if the Company were to remain a standalone entity.   Pursuant to the Merger Agreement, the Company's restricted shares will no longer be subject to their restrictions and will become fully redeemable upon consummation of the Proposed Transaction.   Each of the Individual Defendants

has substantial equity holdings in the Company (in excess of 3% of the outstanding equity) in the form of restricted shares and other forms of equity holdings.  The Proposed Transaction will provide the substantial benefit to the Individual Defendants to liquidate their otherwise illiquid holdings – a benefit not available to the Class.[7]  Additionally, ITC upper management and certain Individual Defendants will remain with the combined company and continue to receive lucrative compensation benefits.

## C.    The Faulty Sales Process

49.    The sales process began, according to the F-4, on March 24, 2015, when Party A, an affiliate of a U.S. publicly traded company, sought to arrange a meeting with the Individual Defendant Welch. Without informing the Board of this contact from a potential bidder for the Company, ITC's management met with Barclays Capital, Inc. ("Barclays") representatives to discuss potential strategic alternatives and the mergers and acquisitions market environment generally on April 9, 2015.   The initial meeting between Welch and Party A occurred on April 28, 2015, followed by another meeting on May 26, 2015. F-4, 52.

50.    On June 11, 2015, Welch continued to investigate a transaction with Party A, by meeting, along with an ITC officer, with Morgan Stanley & Co., LLC ("Morgan Stanley") representatives about engaging Morgan Stanley to "review of potential strategic alternatives, including, among other things, remaining as a stand-alone company." *Id.*  Meetings with Morgan Stanley continued into August, 2015.

51.    Apparently catching wind that ITC might be for sale, on July 21, 2015, Party B, a U.S. publicly traded company, contacted Welch about meeting, but according to the F-4, that meeting never occurred.

---

[7]    Merger Agreement, Section 2.2, Exhibit 2.1 filed February 11, 2016 with SEC.

52.     Between July 27, 2015 and August 4, 2015, Welch met in person with each member of the ITC Board to discuss among other things, Morgan Stanley's preliminary findings with respect to potential strategic alternatives of ITC and Party A's possible interest in a transaction with ITC.   Then, on August 18, 2015, the Board met with Barclays to discuss potential strategic alternatives.   The F-4 fails to discuss what action, if any, Barclays had undertaken to investigate strategic alternatives available to F-4. *Id.*

53.     Morgan Stanley on the other hand, had undertaken a preliminary review of options and on August 19, 2015, presented to the Board and ITC's management, its preliminary review of ITC's potential strategic alternatives, including remaining as a stand-alone entity. After the presentation, the Board authorized management to continue discussions with Party A regarding a possible transaction. On August 20, 2015, Welch and Party A's CEO discussed a potential transaction. F-4, 52-53.   On August 24, 2015, ITC and Party A entered into a non-disclosure agreement, which included a standstill restriction ("NDA").   F-4, 53.

54.     The discussions between ITC and Party A continued. On September 1, 2015, ITC management made a presentation to Party A.   From September 1, 2015 through September 29, 2015, Party A and its advisors conducted a due diligence review of ITC. F-4, 53.

55.     On September 29, 2015, Party A verbally communicated to Welch its proposal to acquire ITC for US$39.00 per share in an all-cash transaction. *Id.*

56.     Fortis, through its representative Goldman, Sachs & Co ("Goldman Sachs") reached out to ITC on October 23, 2015 about a possible acquisition of the Company.   Welch then, without notifying the Board, contacted Fortis' CEO to discuss a possible acquisition.   On November 2, 2015, ITC and Fortis entered into an NDA, with respect to a potential acquisition of ITC.   Later that day, ITC management made a presentation to Fortis. *Id.*

57.     Then on October 27, 2015, Party C, a financial party, reached out to ITC about a potential transaction, followed by a telephone call with Welch on October 31, 2015. *Id.*

58.     Finally, on November 3, 2015, the Board was told about all of the activity that Welch and management had undertaken regarding a sale of the Company since the last Board meeting.  *Id.*

59.     On November 5, 2015, ITC and Party C also signed NDAs (with a standstill provision). Party B also entered into an NDA later in November.  F-4, 54.  The parties who signed the NDAs were given access to ITC information to perform due diligence.

60.     On November 5, 2015, ITC engaged Barclays and Morgan Stanley as financial advisors in connection with the strategic review process.  The F-4 fails to disclose the basis for retaining two financial advisors or the manner in which their duties and responsibilities were allocated. *Id.* Barclays and Morgan Stanley thereafter contacted Fortis, Parties A, B and C, and one additional party, Party D (a financial entity) a potential transaction. Thus, the financial advisors reached out only to one additional entity, but the F-4 fails to disclose the basis for not contacting additional potential bidders, other than a generic view that there would be no other credible parties who could consummate a potential transaction.  After Barclay's and Morgan Stanley's contact, Party A declined to participate further.  Party B also later withdrew from negotiations in November. The F-4 fails to disclose the basis for Party A's and B's withdrawal from the process. F-4, 54, 55. Party D later signed an NDA (with standstill). F-4, 55.

61.     On November 12, 2015, Fortis made an initial preliminary proposal to ITC of US$44.25 per share in cash and asked for exclusive negotiations with ITC. The request for exclusive negotiations was rejected.  On the same day, the Board met to discuss Fortis' proposal

and reviewed the Company's forecast for 2016-2020, which the Board agreed would be provided to interested parties.

62.     On November 30, 2015, information about ITC's review process was leaked and news media published an article about the process, suggesting the Company could be sold for US$45.00 per share. ITC's stock rose on the publication of the story to US$37.84 per share.

63.     After the news broke, between November 30, 2015 and December 16, 2015, 26 potentially interested parties contacted Barclays and Morgan Stanley about the Company and the review process, including the some of the parties already contacted. Of these, Parties E (a financial entity) and F (strategic entity) showed interest in a potential transaction. Party E later entered into an NDA with the same terms as those applying to the other parties. F-4, 56.

64.     On November 30, 2015, Party C and Party D, with the permission of ITC, executed a teaming agreement to allow Party C and Party D to enter into discussions and arrangements with respect to making a joint proposal with respect to a potential transaction involving ITC.  Party D withdrew from the process in December.

65.     On December 2, 2015, the ITC board of directors met and among other things finally formed a committee ("Committee") to be responsible for the strategic review process, with Defendants Ernst, O'Leary and Stewart. Also during December, Defendants were working on a proposed merger agreement to present to potential bidders. The Committee considered whether the Board should retain its own financial advisor. The F-4 fails to disclose the rational for the Board's need to retain its own advisor.  The draft merger agreement was circulated to potential bidders and a January 5, 2016 deadline imposed to receive markups. F-4, 56.

66.     On December 11, 2015, ITC agreed that Party C could partner with Party E, and a separate teaming agreement with Party C and Party E was executed to allow them to make a

proposal. At some point, and for undisclosed reasons, Parties C, E and Party F (which also had to sign the NDA to join) sought to partner together to make an offer for the Company. The F-4 refers to this group as the "Consortium." F-4, 57.

67.     At a December 17, 2015 Board meeting, the Board decided, among other things, to engage its own financial advisor. The F-4 fails to disclose the rational for incurring more expenses to engage another financial advisor. Ultimately, Lazard Freres &Co. ("Lazard")was engaged. *Id.*

68.     Thereafter, Fortis and ITC continued their discussions including exchanging markups of the merger agreement ITC had circulated. F-4, 58.

69.     On January 5, 2016, Fortis submitted a mark-up of a draft of the merger agreement among other supplemental documents. The Consortium was unable to meet the January 5 deadline but stated that it would send its revisions and a proposal offer by January 11, 2016. Thereafter, the parties negotiated the terms of the merger agreement, including Fortis' proposal to sell off portions of ITC to additional equity investors, as well as certain "management succession planning," which ITC was also discussing internally.  F-4, 58.  Fortis sought to have veto power over any ITC senior management changes between signing a merger agreement and consummation of a transaction. Fortis also discussed Welch's future employment with the combined company. The Committee also discussed these employment issues. F-4, 59.

70.     On January 11, 2016, Fortis submitted a proposal to acquire ITC for US$44.25 per share in an all-cash transaction ("January 11 Fortis Proposal"). The January 11 Fortis Proposal permitted ITC to continue to pay its regularly scheduled quarterly dividends, which could be increased by up to 10% beginning on August 1, 2016. The January 11 Fortis Proposal also included executed financing commitment papers with respect to financing for the potential

transaction and a memorandum that discussed certain key merger agreement issues that had been discussed between the respective legal advisors of ITC and Fortis.  However, Fortis on the same day withdrew this proposal after it received an unfavorable report from a debt rating agency regarding the proposal.  ITC then agreed to extend the review process to allow Fortis to restructure its proposal.  Fortis submitted its revised proposal on January 15, 2016, to acquire IRC for US$41.00 per share in a cash and stock transaction consisting of 54% in cash and 46% in Fortis shares ("January 15 Fortis Proposal"). *Id.*

71.    On that same day, the Consortium submitted a proposed mark-up to the merger agreement and a proposal to acquire ITC for US$37.00 per share in an all-cash transaction, subject to, among other things, completion of an advisory and evaluation process with certain rating agencies and completion of its confirmatory due diligence process, which, as previously communicated to ITC by the Consortium, would require an additional three to four weeks to complete. *Id.*

72.    On January 16, 2016, an undisclosed ITC director (and defendant) affiliated with Party G, a U.S. publicly traded company, informed Welch that Party G might be interested in exploring a potential merger of Party G and ITC. The ITC director affiliated with Party G verbally expressed an interest in a stock-for-stock transaction with a preliminary valuation of ITC at approximately US$45.00 per share. On January 16, 2016, representatives of an investment banking firm, on behalf of Party G, contacted Lazard to discuss the potential transaction involving ITC and Party G.  Following discussions with ITC's attorneys, the undisclosed Director/Defendants purportedly recused himself from the sales process.  *Id.*

73.    During the week of January 18, 2016, ITC sought to negotiate increases of the proposals from Fortis and the Consortium. *Id.*  ITC's advisors then also contacted Party A about

increasing its $39.00 proposal that it submitted in September, 2015 (which it later stated it would not do). The Consortium increased its proposal to $37.50 in cash on January 22, 2016. F-4, 60. Thereafter, ITC's advisor continued discussions with Party A, G, the Consortium, and Fortis and advised them that ITC needed their best and final offers before a scheduled February 1, 2016 ITC Board meeting. Party G indicated it was interested in a stock-for-stock merger with ITC valuing ITC within a range of US$39.00 to US$42.00 per share and indicated that Party G would need approximately three weeks to complete confirmatory due diligence. *Id.*

74.     On January 27, 2016, ITC began additional reverse due diligence of Fortis. In addition, ITC (which continued through February 1, 2016) and Party G entered into an NDA (with the same terms as with the other interested parties) and engaged in due diligence. *Id.*

75.     On February 1, 2016, information was leaked to the media about the bids received. The closing price of ITC common stock on this date was US$40.33 per share. *Id.*

76.     On February 3, 2016, Fortis delivered to ITC a revised proposal to acquire ITC in a cash and stock transaction consisting of a fixed exchange ratio of 0.7520 Fortis common shares plus US$22.57 in cash for each share of outstanding ITC stock, representing at the time, a total value of US$44.46 per share of ITC common stock based on the closing price of Fortis common shares of $40.86 and an exchange rate of 0.712504 Canadian dollars per US dollar as of February 2, 2016. Fortis also delivered a revised draft of the merger agreement with its proposal. F-4, 61.

77.     On February 3, 2016, Party G made a proposal to acquire ITC in an all-stock transaction valuing ITC within a range of US$40.00 to US$43.00 per share. Party G also indicated that it would require approximately three additional weeks to complete its due

diligence of ITC upon being granted access to the virtual data room. Party G did not submit a mark-up of the draft merger agreement. *Id.*

78.     In February, ITC's reverse due diligence of Fortis continued and the parties also continued to negotiate the terms of a merger agreement. ITC also continued due diligence of Party G. *Id.*

79.     On February 6, 2016, representatives of Lazard provided a list of reverse due diligence questions to representatives of Party G.

80.     However, ITC focused its efforts on Fortis, including internal discussions of Fortis' requirement to have veto authority over senior management employment through the consummation of a transaction. ITC was concerned of the consequences of this term if the transaction did not close. The main issue was Welch's future with the Company and the Board discussed retaining him as an at-will employee.

81.     At a February 8, 2016 Board meeting, Barclays, Morgan Stanley and Lazard were making presentations regarding a proposed transaction with Fortis, Party A, Party G and the Consortium. Party G during this meeting revised its all stock proposal to value ITC at $43.25 per share, but indicated it would need an additional two weeks of due diligence. The F-4 fails to disclose other critical information regarding this revised Party G proposal that shareholders must have to consider whether to approve the Proposed Transaction, including whether the Party G proposal reflected a collar to retain the implied share value of ITC, in contrast to the Fortis proposal. F-4, 63. Ultimately, the Board voted in favor of the Fortis proposal despite the Welch employment and other issues and despite revised Party G proposal .*Id.*

**D.     The Preclusive Deal Protection Devices**

82.     In addition to the woefully inadequate consideration offered to ITC shareholders

obtained through the unfair and inadequate sales process, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

83.     First, the Merger Agreement contains a strict "no shop" provision prohibiting the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations.   The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Defendants from even engaging in discussions or negotiations relating to proposals regarding alternative business combinations. Section 7.1(a) no solicitation provision provides that neither the Company nor anyone on its behalf may solicit, initiate, facilitate or encourage alternative proposals in an attempt to procure a price in excess of the amount offered by Fortis ("Acquisition Proposal").   This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors.

84.     The Merger Agreement at section 7.1(a) also requires the Company to notify Fortis of certain unsolicited competing offers and to provide Fortis with information regarding such Acquisition Proposals within 24 hours.

85.     Pursuant to §7.2(d) of the Merger Agreement, the Board may not recommend against the Proposed Transaction unless it gives Fortis notice and all information concerning a superior proposal and a three (3) business day period after the delivery of the notice during which it must negotiate with Fortis so that Fortis has the opportunity to adjust the terms and conditions of the Merger Agreement so that the competing proposal ceases to be a superior

26

proposal. Accordingly, the Merger Agreement unfairly assures that any "auction" will favor Fortis and piggy-back upon the due diligence of the foreclosed alternative bidder.

86.     In addition, Section 9.2(b) of the Merger Agreement provides that ITC must pay to Fortis a termination fee of up to $245 million if the Company decides to pursue another offer, thereby essentially requiring that any alternate bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer

87.     As a result of these provisions, even if a competing bidder were inclined to pay $245 million for the privilege of bidding on ITC, it would be faced with two additional hurdles: (1) negotiations with a Board that chose to enter into a Merger Agreement with Fortis; and (2) a material informational and negotiating disadvantage, as the specifics of its bid would be relayed to Fortis in real time, while any matching or topping bid by Fortis would not be reciprocally relayed back to it. In other words, in addition to paying the termination fee just to bid on ITC, any such competing bidder would be required to bid in the dark and against itself.

88.     These provisions and agreements are unreasonable and unlawful will cumulatively discourage other potential bidders from making a competing bid for the Company. Similarly, these provisions and agreements make it more difficult for the Company and individual shareholders to exercise their rights and to obtain a fair price for the Company's shares.

**E.      The Materially Incomplete and Misleading F-4**

89.     On March 17, 2016, Fortis filed the F-4 with the SEC in connection with the Proposed Transaction. The F-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

Specifically, the F-4 fails to provide the Company's shareholders with material information concerning the process leading up to the consummation of the Merger and information concerning the financial analyses and work performed for ITC and the Board by Barclays, Morgan Stanley, and Lazard.   As a result of the incomplete and misleading F-4, ITC's shareholders will be unable to make an informed decision concerning whether to vote for or against the Merger.

**Materially Incomplete and Misleading Disclosures Concerning the Background of the Proposed Transaction**

90.   The F-4 fails to provide material information concerning the process conducted by the Board and the events leading up to the signing of the Merger Agreement.  In particular, the *Background of the Merger* section (and other sections identified below) contained on pages 52-63 (and other sections identified below) of the F-4  is materially deficient in that it fails to disclose the following information:

(a)   The efforts of Barclays and Morgan Stanley to investigate possible strategic or other transactions between March 24, 2015 and presentations made to the Board on August 18 and 19, 2015 respectively (F-4, 53);

(b)   The basis and rational for the Board's support of a fixed exchange ratio as part of the Merger Consideration in the Proposed Transaction (F-4, 61, 63);

(c)   The basis for the retention by the Company of Barclays and Morgan Stanley in connection with the strategic review process and rendering fairness opinion on the Proposed Transaction (F-4, 54);

(d)   The basis for the Board's retention of Lazard to advise the Board in connection with the strategic review process (F-4, 56);

(e)     The actions taken by Barclays and Morgan Stanley to determine there were no credible parties to contact about a potential acquisition of the Company beyond Fortis, Parties A, B, C and D on November 5, 2015 (F-4, 55);

(f)     The date when Fortis began discussing Welch's continued employment with a combined company post-merger, including compensation;

(g)     Details of Party G's revised proposal on February 8, 2016 that, including whether the Party G proposal reflected a collar to retain the implied share value of ITC and the the basis for the Board's conclusion on February 8, 2016 when it considered Party G's revised proposal, that the multiples of  earnings at which ITC is valued and multiple of earnings at which companies in the industry in which Party G operated are valued would likely result in substantial degradation in value for ITC shareholders if the two companies were combined, and that there was a substantial risk that Fortis would abandon its pursuit of ITC, or adversely change the terms of its proposal, were ITC to delay the process for the period of time that Party G indicated it would require to finalize its proposal (F-4, 63);

(h)     The basis on which the Board may, in its discretion, pay Lazard an additional fee of up to $2million.  (reflected in Lazard Opinion section at F-4, 82);

(i)     The rationale for the Board's instruction to its analysts not to take into account the potential financial impact on ITC of certain business opportunities that may become available  to it, including in particular future capital investments by ITC in Mexico and Puerto Rico (see Opinion of Barclays, F-4, 85);

91.     The omission of the above information renders statements in the F-4's "Background of the Merger" and "ITC's Reasons for the Merger; Recommendation of ITC

Board of Directors" sections false and/or materially misleading in contravention of the Exchange Act.

**Materially Incomplete and Misleading Disclosures Concerning ITC's and Fortis' Financial Information and Bankers' Analyses**

92.     The F-4 fails to provide certain ITC and Fortis non-public projected financial data and/or assumptions relating to each company's future performance on which the ITC financial advisors and the Individual Defendants relied in recommending and/or approving the Proposed Transaction.  These omissions render the F-4 false and/or misleading as this information was relied on and utilized by the Board, Barclays, Morgan Stanley and/or Lazard.

93.     The Section of the F-4 entitled "ITC's Reasons for the Merger: Recommendation of the ITC Board of Directors" (F-4, 67), discloses that the Board relied on: (i) ITC's financial plan (F-4,68); and (ii) "near term financing needs given its strong operating cash flows… its strong free cash flow profile…" (F-4, 71).  Additionally, the Board reviewed and relied on forecast for 2016-2020 and provided these forecasts to certain interested parties. F-4, 55-56, 103.

94.     The Board's recommendation is false and/or misleading because despite relying on and utilizing internal non-public ITC and Fortis financial data, including free cash flows, to recommend that ITC shareholder vote in favor of the Proposed Transaction, that non-public financial data, including especially the Company's and Fortis' free cash flows (which also was relied on and incorporated into certain valuation methodologies by Barclays, Morgan Stanley and Lazard)  are not disclosed in the F-4.  Absent the data on the Company's and Fortis' future performance, shareholders cannot to weigh and gauge the Board's recommendation.  This material information must be disclosed to shareholders prior to any shareholder vote on the Proposed Transaction.

95.     The F-4 also discloses that the financial advisors, Barclays, Morgan Stanley, and Lazard relied on and utilized non-public ITC (and Fortis) financial data to render their fairness opinions, but certain material ITC (and Fortis) financial data is not disclosed. Thus, the F-4 provides that Lazard utilized ITC's estimated financial projections (F-4, 74) and future cash flows in particular to perform its Discounted Cash Flow Analysis ("DCF")(F-4, 78) and Discounted Cash Flow Sensitivity Analysis (F-4, 82).  The F-4 provides that Barclays utilized ITC unlevered free cash flows "based on ITC Projections" to perform its Discounted Cash Flow Analysis (F-4, 89).  The F-4 provides that Morgan Stanley also  performed a Discounted Cash Flow Analysis (F-4, 96), based on estimates of future cash flows for calendar years 2016 through 2020 and the terminal year "utilizing internal estimates of ITC management."  Lazard, Barclays and Morgan Stanley also relied on Fortis Projections, including cash flows, for certain valuations of Fortis shares to render their Fairness Opinions. (F-4, at 74 (Lazard), 84 (Barclays), and 93 (Morgan Stanley). The future cash flows projected by ITC management (and Fortis management) are not disclosed in the F-4. This information is integral to shareholders' evaluation of the Merger Consideration being offered in the Proposed Transaction.  Indeed, the projected financial information and data provide a sneak peek into ITC's and Fortis' expected future performance and, consequently, its value as a standalone entity.   More importantly, however, this expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the Company.  Accordingly, projected financial metrics and data, including especially future cash flows, are among the most highly sought after disclosures by investors in the context of corporate transactions such as this.

96.     The failure to disclose the internal ITC and Fortis' management projections of Company cash flow, which form the critical basis for the Discounted Cash Flow Analyses renders those analyses (Lazard at F-4, 78 and 82, Barclays at F-4, 89, and Morgan Stanley at F-4, 96) and the fairness opinions of each of those advisors in the F-4 false and/or misleading.

**Materially Incomplete and Misleading Disclosures Concerning Specific Lazard Valuation Analyses**

97.     In addition to failing to disclose internal management cash flow projections, which render the DCF analyses misleading, the DCF analysis and other valuation methodologies performed by Lazard (and Barclays and Morgan Stanley as described below) are false and/or misleading based on the following omissions.

98.     With respect to Lazard's *Selected Comparable Company Multiples Analysis* (F-4, 76), which was performed for ITC and Fortis, the F-4 fails to disclose the individual financial metrics from each company used for the analysis. The F-4 discloses the 2016 and 2017 P/E multiples ranges and 2016 and 2017EBITDA multiples range, but fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies.  The F-4 further fails to disclose the rational for equalizing the life of ITC's asset base in order to determine adjusted EBITDA.

99.     The omission of this information renders the following statements from pages 77-78 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

> The EPS and EBITDA estimates for each of the ITC comparable companies and the Fortis comparable companies used by Lazard in its analysis were based on Wall Street research, which represents publicly available consensus estimates. The following table summarizes the results of this review:

| | ITC Comparable Companies Multiples | Fortis Comparable Companies Multiples |
|---|---|---|
| Share Price to 2016E EPS (2016 P/E Multiple) | 17.7x - 19.5x | 17.3x - 19.8x |
| Share Price to 2017E EPS (2017 P/E Multiple) | 16.9x - 18.3x | 16.3x - 18.4x |
| Enterprise Value to 2016E EBITDA | 9.1x - 11.4x | 8.2x - 11.4x |

Enterprise Value to 2017E EBITDA                    8.7x - 10.8x                    7.8x - 10.8x

***

This analysis resulted in an implied price per share range for shares of ITC common stock and Fortis common shares, as compared to the merger consideration, as set forth below:

| Implied ITC Price Per Share Range | Implied Fortis Price Per Share Range | Merger Consideration |
|---|---|---|
| US$34.50 - US$39.75 | US$26.25 - US$31.00 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

100.    These statements in the F-4 are rendered false and/or misleading by the omissions identified in ¶98 because such omissions are essential to shareholders' ability to properly evaluate the analysis performed by Lazard.

101.    With respect to Lazard's *Discounted Cash Flow Analysis* (F-4, 78-79) prepared for both ITC and Fortis, in addition to the failure to disclose ITC's future cash flows discussed above, the F-4 fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for ITC and Fortis in its analysis; (ii) the weighted average cost of capital ("WACC"). In a DCF analysis, WACC is an assessment of what it costs for a company to access financing. Utilizing a higher WACC in a DCF analysis will yield a lower valuation of a company. Lazard appears to have utilized rates higher than the average cost of capital for utilities and power industries.[8]    Thus, Lazard appears to have utilized an above-average discount rate, making the inputs and assumptions Lazard used to derive the discount rate and the Company's WACC particularly material.

102.    The omission of the above information renders the following statements from page 79 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

---

[8]    http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/wacc.htm

Lazard averaged the price per share ranges implied by these calculations and, based on that analysis, reviewed the implied price per share range for shares of ITC common stock and Fortis common shares, as compared to the merger consideration, as set forth below:

| Implied ITC Price Per Share Range | Implied Fortis Price Per Share Range | Merger Consideration |
|---|---|---|
| US$38.75 - US$45.75 | US$29.25 - US$35.25 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016) |

103.    These statements/metrics in the F-4 are rendered false and/or misleading by the omissions identified in ¶101 because such omissions are essential to shareholders' ability to properly evaluate the analysis performed by Lazard including flaws in its analysis and assess the reliability of the DCF analysis.  The omission of these metrics renders the implied present value per share of ITC (and Fortis) common stock ranges and the statements that the Merger Consideration is "fair" misleading, because without these metrics shareholders are unable to determine whether the ranges accurately reflect the value of their shares.

104.    With respect to Lazard's *Discounted Cash Flow Sensitivity Analysis* (F-4, 82), Lazard performed an analysis similar to the DCF analysis but also included 10%, 25% and 100% of the Company's unlevered free cash flows associated with ITC's projects in Puerto Rico and Mexico. The F-4 fails to disclose the free cash flow and the cash flow calculations associated with Puerto Rico and Mexico projects, which renders the following statements from page 82 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

Lazard performed a Discounted Cash flow sensitivity analysis of ITC using the same methodology as set forth above in "—Discounted Cash Flow Analysis," except Lazard also included 10%, 25% and 100% of the unlevered free cash flows associated with ITC's projects in Puerto Rico and Mexico. This analysis resulted in an implied price per share range for shares of ITC common stock, as compared to the merger consideration, as set forth below:

| Implied ITC Price Per Share Range (10% of Additional Unlevered Free Cash Flows) | Implied ITC Price Per Share Range (25% of Additional Unlevered Free Cash Flows) | Implied ITC Price Per Share Range (100% of Additional Unlevered Free Cash Flows) | Merger Consideration |
|---|---|---|---|
| US$39.25 - US$46.25 | US$39.50 - US$47.00 | US$42.00 - US$50.00 | US$22.57 in cash and 0.7520 Fortis common shares (equivalent to US$45.05 per share based upon Fortis' closing share price and the Canadian dollar-to-US dollar exchange rate on February 5, 2016 |

105.    These statements/metrics in the F-4 are rendered false and/or misleading by the omissions identified in ¶104 because such omissions are essential to shareholders' ability to properly evaluate the analysis performed by Lazard including flaws in its analysis and assess the reliability of the DCF Sensitivity Analysis.  The omission of these metrics renders the implied present value per share of ITC (and Fortis) common stock ranges and the statements that the Merger Consideration is "fair" misleading, because without these metrics shareholders are unable to determine whether the ranges accurately reflect the value of their shares.

**Materially Incomplete and Misleading Disclosures Concerning Specific Barclays Valuation Analysis**

106.    With respect to Barclays' *Selected Comparable Company Analysis* (F-4, 87-88), Barclays selected a range of multiples (price-to-earning and price-to-book value) for ITC and applied that selected range to the ITC Projections (internal ITC projections prepared by management) to calculate a range of implied prices per share of ITC common stock. The F-4 fails to disclose the basis on which Barclays selected the range of multiples.  This section of the F-4 is materially misleading because it fails to disclose the individually observed multiples for each of the Comparable Companies, and fails to disclose the range, mean, and median multiples for the overall population of Comparable Companies.  Moreover, the "ITC Projections" on which Barclays relied are not disclosed. Instead, the F-4 only discloses the "selected"

comparable company multiple ranges the Barclays applied, which were selected from the overall population of multiples.  This information is material to ITC shareholders' ability to observe flaws in Barclays' analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration.  Without the omitted information, ITC shareholders are unable to determine whether the ranges accurately reflect the value of their ITC and the omission of this information renders the below Barclays' implied value per share ranges (F-4, 87) and the statements that the Merger Consideration is "fair" misleading:

The following summarizes the result of these calculations:

| | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| P/E | LTM P/E 18.5x - 20.5x | US$34.72 - US$38.60[1] |
| | 2016E P/E 17.3x - 19.3x | |
| P/B | 1.6x - 2.1x | US$17.42 - US$22.96 |

(1)This range of implied values per share reflects the average of the LTM and 2016E P/E multiples.

107.     Barclays performed a *Selected Comparable Company Analysis* for Fortis (F-4, 90) and selected a range of multiples (price-to-earning and price-to-book value) for Fortis and applied that selected range to the Fortis Projections (internal Fortis projections prepared by management (see F-4, 84) to calculate a range of implied prices per share of Fortis common stock. The F-4 fails to disclose the basis on which Barclays selected the range of multiples.  This section of the F-4 is materially misleading because it fails to disclose the individually observed multiples for each of the Comparable Companies, and fails to disclose the range, mean, and median multiples for the overall population of Comparable Companies.  Instead, the F-4 only discloses the "selected" comparable company multiple ranges the Barclays applied, which were selected from the overall population of multiples.   This information is material to ITC

shareholders' ability to observe flaws in Barclays' analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration.   Without the omitted information, ITC shareholders are unable to determine whether the ranges accurately reflect the value of their ITC and the omission of this information renders the below Barclays' implied value per share ranges (F-4, 91) and the statements that the Merger Consideration is "fair" misleading:

|  | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| P/E | LTM P/E 18.3x - 20.3x | US$27.00 - US$30.00[1] |
|  | 2016E P/E 17.7x - 19.7x |  |
| P/B | 1.8x - 2.3x | US$37.59 - US$47.91 |

(1)This range of implied values per share reflects the average of the LTM and 2016E P/E multiples.

108.   With respect to Barclays' *Selected Precedent Transaction Analysis* (F-4, 88), Barclays first discloses that it made certain undisclosed "qualitative" judgments concerning the differences between the characteristics of the selected transactions and the Merger that affected the acquisition values of the selected target companies and ITC, but fails to disclose any information about those qualitative judgments.   Barclays also selected a range of multiples for ITC and applied the range to the ITC Projections to calculate a range of implied prices per share of ITC common stock.[9]   This section of the F-4 is materially misleading because it fails to disclose the individually observed multiples for each of the transactions, and fails to disclose the range, mean, and median multiples for the overall population of comparable transactions.

---

[9]    The multiples ranges were based on the ratios of the applicable target companies' forward looking P/E for the first fiscal year following announcement of the transaction based on I/B/E/S consensus estimates, Enterprise Value (total equity market capitalization, plus debt, less cash and cash equivalents), or EV, to their rate base ("EV/Rate Base," where "Rate Base" is the value of the property on which a regulated public utility is allowed to earn a rate of return, determined in accordance with rules set by its regulators) and P/B ratios and applied such ranges to the ITC Projections to calculate ranges of implied prices per share of ITC common stock.  F-4, 88.

Instead, the F-4 only discloses Barclays' selected range of comparable transactions multiples, which were selected from the overall population of multiples for all of the comparable transactions.   This information is material to ITC shareholders ability to observe flaws in Barclays' analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration.   The omission of this information renders Barclays' below implied value per share ranges and the statements that the Merger Consideration is "fair" false and/or misleading:

| | Selected Multiple Range | Implied Value Per Share of ITC common stock |
|---|---|---|
| FY1 P/E | 18.0x - 25.0x | US$37.12 - US$51.55 |
| EV/Rate Base | 1.5x - 2.1x | US$20.71 - US$41.70 |
| P/B | 1.6x - 2.5x | US$17.47 - US$28.11 |

Barclays noted that on the basis of the selected precedent transaction analysis, the implied value of the merger consideration of US$45.05 was (i) within the range of implied values per share of ITC common stock calculated using P/E ratios, and (ii) above the ranges of implied values per share of ITC common stock calculating using EV/Rate Base and P/B ratios, in each case utilizing the ITC Projections.

109.   Without the omitted information, ITC shareholders are unable to determine whether the ranges accurately reflect the value of their ITC shares.

110.   With respect to Barclays' *Discounted Cash Flow Analysis* (F-4, 89) prepared for ITC, in addition to the failure to disclose ITC's future cash flows discussed above, the F-4fails to disclose: (i) the inputs and assumptions used to derive the discount rates  employed for ITC in its analysis, and the (ii) the WACC.  Barclays appears to have utilized rates higher than the average cost of capital for utilities and power industries.[10]  Thus, Barclays appears to have utilized an above-average discount rate, making the inputs and assumptions Barclays used to derive the discount rate and the Company's WACC particularly material.

---

[10]      http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/wacc.htm

111.    The omission of the above information renders the following statements from page 89 of the F-4 false and/or materially misleading in contravention of the Exchange Act: "The result of this analysis implied a range of values per share of ITC common stock of US$40.62 to US$46.66." F-4, 89.

112.    With respect to Barclays' *Discounted Cash Flow Analysis* (F-4, 91) prepared for Fortis, in addition to the failure to disclose Fortis' future cash flows discussed above, the F-4 fails to disclose: (i) the inputs and assumptions used to derive the discount rates  employed for Fortis in its analysis, and the (ii) the WACC.  Barclays appears to have utilized rates higher than the average cost of capital for utilities and power industries.[11]   Thus, Barclays appears to have utilized an above-average discount rate, making the inputs and assumptions Barclays used to derive the discount rate and the Company's WACC particularly material.

113.    The omission of the above information renders the following statements from page 91 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

> The result of this analysis implied a range of values per Fortis common share of $36.07 to $41.29. Barclays noted that on the basis of the DCF analysis, the closing price of $41.47 per Fortis common share (US$29.89, based on a US dollar-to-Canadian dollar exchange ratio of 0.72086 as of February 5, 2016) on February 5, 2016, the last full trading day prior to rendering of its opinion, was below the range of implied values per Fortis common share calculated using the Fortis Projections.

**Materially Incomplete and Misleading Disclosures Concerning Specific Morgan Stanley Valuation Analysis**

114.    With respect to Morgan Stanley's *Comparable Public Companies Analysis,* which was performed for ITC (F-4, 95), the F-4 fails to disclose the individual financial metrics from each company used for the multiples analysis (stock price to 2016 E unadjusted EPS, stock price to 2016 estimated adjusted EPS, and stock price to 2017 estimated EPS). The F-4 discloses the

---

[11]     http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/wacc.htm

Price to EPS multiples ranges, but fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies. This section of the F-4 is materially misleading because it fails to disclose the individually observed multiples for each of the Comparable Companies, and fails to disclose the range, mean, and median multiples for the overall population of Comparable Companies. This information is material to ITC shareholders ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration. The omission of this information renders Morgan Stanley's s implied value per share ranges at page 96, reflected below, and the statements that the Merger Consideration is "fair" misleading. Without the omitted information, ITC stockholders are unable to determine whether the ranges accurately reflect the value of their ITC shares:

> Based on this analysis, Morgan Stanley derived a range of approximate implied equity value per share of ITC common stock as follows:
>
> • stock price to 2016 estimated unadjusted EPS—US$35.50 - US$41.00;
> • stock price to 2016 estimated adjusted EPS—US$39.00 - US$45.00; and
> • stock price to 2017 estimated EPS—US$37.50 - US$43.25,
>
> as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash, 0.7520 of a Fortis common share per share of ITC common stock, a Fortis common share price of $29.89, and a US dollar-to-Canadian dollar exchange rate of 0.7209).

115. Morgan Stanley performed *Comparable Public Companies Analysis* for Fortis based on similar inputs (F-4, 98-99). As with the ITC analysis, the F-4 fails to disclose the individual financial metrics from each company used for the multiples analysis (stock price to 2016 E EPS, and stock price to 2017 estimated EPS). The F-4 discloses the Price to EPS multiples ranges, but fails to disclose whether these ranges represent the high-low or were derived based on the median/mean of the observed companies. This section of the F-4 is

materially misleading because it fails to disclose the individually observed multiples for each of the Comparable Companies, and fails to disclose the range, mean, and median multiples for the overall population of Comparable Companies. This information is material to ITC shareholders ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration. The omission of this information renders Morgan Stanley's s implied value per share ranges at page 99, reflected below, and the statements that the Merger Consideration is "fair" misleading. Without the omitted information, ITC stockholders are unable to determine whether the ranges accurately reflect the value of their ITC shares:

> Based on this analysis, Morgan Stanley derived a range of approximate implied equity value per Fortis common share as follows:
>
> •stock price to 2016 estimated adjusted EPS—US$25.75 - US$29.50; and
> •stock price to 2017 estimated EPS—US$26.75 - US$28.25.

116.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis* (F-4, 96-97) prepared for ITC, in addition to the failure to disclose ITC's future cash flows discussed above, the F-4 fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for ITC in its analysis, and the (ii) the WACC. Morgan Stanley appears to have utilized rates higher than the average cost of capital for utilities and power industries.[12] Thus, Morgan Stanley appears to have utilized an above-average discount rate, making the inputs and assumptions Morgan Stanley used to derive the discount rate and the Company's WACC particularly material.

---

[12] http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/wacc.htm

117.    The omission of the above information in ¶116 renders the following statements from page 97 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

> This analysis indicated approximate implied equity value per share reference ranges for ITC common stock of US$39.00 to US$49.75, as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash and 0.7520 of a Fortis common share per share of ITC common stock, a Fortis share price of US$29.89 and a US dollar-to-Canadian dollar exchange rate of 0.7209).F-4, 97.

118.    With respect to Morgan Stanley's *Discounted Cash Flow Analysis* (F-4, 99-100) prepared for Fortis, in addition to the failure to disclose Fortis' future cash flows discussed above, the F-4fails to disclose: (i) the inputs and assumptions used to derive the discount rates employed for Fortis in its analysis, and the (ii) the WACC.  Morgan Stanley appears to have utilized rates higher than the average cost of capital for utilities and power industries.[13]  Thus, Morgan Stanley appears to have utilized an above-average discount rate, making the inputs and assumptions Morgan Stanley used to derive the discount rate and the Company's WACC particularly material.

119.    The omission of the above information ¶118 renders the following statements from page 100 of the F-4 false and/or materially misleading in contravention of the Exchange Act:

> This analysis indicated approximate implied equity value per share reference ranges for Fortis common shares of US$33.75 to US$38.75.

120.    With respect to Morgan Stanley's *Analysis of Selected Precedent Transactions and Premiums Paid* (F-4, 97), the F-4 fails to disclose the individually observed multiples and premiums for each of the transactions, and fails to disclose the mean, and median multiplesthe overall population of comparable transactions.   Instead, the F-4 only discloses Morgan Stanley's

---

[13] http://people.stern.nyu.edu/adamodar/New_Home_Page/datafile/wacc.htm

selected range of comparable transactions multiples and premia Morgan Stanley applied, which were selected from the overall population for all of the comparable transactions. This information is material to ITC shareholders ability to observe flaws in Morgan Stanley's analysis and to assess the reliability of the analysis as supporting the fairness of the Merger Consideration. The omission of this information renders the below statements, including implied value per share ranges and the statements that the Merger Consideration is "fair" misleading:

> Morgan Stanley compared certain financial and market statistics of the selected precedent transactions. Based on an assessment of the utility acquisitions, Morgan Stanley applied a premium to the price as of the unaffected date of US$33.75 ranging from 14.7% to 48.3%, as well as a multiple to ITC's 2016 estimated unadjusted earnings ranging from 18.3x - 23.3x. Based on the analysis of utility acquisitions, Morgan Stanley calculated an approximate per-share price for ITC common stock ranging from US$38.75 to US$50.00 (in the case of the premium to unaffected share price), and US$37.75 to US$48.00 (in the case of the multiple to ITC's estimate of its 2016 estimated unadjusted earnings), as compared to the merger consideration of US$45.05 as of February 5, 2016 (based on US$22.57 in cash and 0.7520 of a Fortis common share per share of ITC common stock, a Fortis common share price of US$29.89 and a US dollar-to-Canadian dollar exchange rate of 0.7209).

## COUNT I

### Claim for Violations of Section 14(a) of the Exchange Act
### Against the Company and the Individual Defendants

121.     Plaintiff repeats and realleges each and every allegation set forth herein.

122.     The Defendants issued the F-4 with the intention of soliciting ITC shareholder support for the Proposed Transaction.

123.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or

43

misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

124.    Specifically, the F-4 violates Section 14(a) and Rule 14a-9 because it omits material facts as set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the F-4 is materially misleading and omits material facts that are necessary to render it non-misleading.

125.    The misrepresentations and omissions in the F-4 are material to Class Members who will be deprived of their right to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  As a direct and proximate result of Defendants' conduct, Plaintiff and the other Class Members will be irreparably harmed.

126.    Relief for the claims asserted in this Count I should be granted as there is no adequate remedy at law for these claims.

## COUNT II

### Claim For Violating Section 20(a) of the Exchange Act
### Against the Individual Defendants

127.    Plaintiff repeats and realleges each and every allegation set forth herein.

128.    The Individual Defendants acted as controlling persons of ITC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the ITC, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the F-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the

various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

129.     Each of the Individual Defendants were provided with or had unlimited access to copies of the F-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

130.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.  The F-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

131.     In addition, as the F-4 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The F-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

132.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

133.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling

persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

134.    Plaintiff and the Class have no adequate remedy at law.

## COUNT III

### Claim For Breach of Fiduciary Duties Against the Individual Defendants

135.    Plaintiff repeats and realleges each and every allegation set forth herein.

136.    The Individual Defendants have violated fiduciary duties of care, loyalty, and good faith owed to public shareholders of ITC.

137.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in ITC.

138.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, and independence owed to the shareholders of ITC because, among other reasons, they failed to take steps to maximize the value of ITC to its public shareholders.

139.    The Individual Defendants dominate and control the business and corporate affairs of ITC, and are in possession of private corporate information concerning ITC assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of ITC which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

140.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

141.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of ITC assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

142.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

143.    Plaintiff and the Class have no adequate remedy at law.   Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in her favor and in favor of the Class, and against the Defendants as follows:

A.      Certifying this case as a class action, certifying Plaintiff as class representative and their counsel as class counsel;

B.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Defendants disclose the material information identified above which has been omitted from the F-4, and unless and until the Company adopts and implements a procedure or process to obtain a transaction providing the best possible terms for shareholders;

C.      Directing the Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of ITC shareholders;

D.    Rescinding, to the extent already implemented, the Proposed Transaction,  or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.    Awarding Plaintiff and the Class appropriate compensatory damages;

F.    Awarding Plaintiff the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees and, if applicable, pre-judgment and post-judgment interest; and

G.    Awarding Plaintiff and the Class such other relief as this Court deems just, equitable, and proper.

Dated: March 23, 2016

**ANTHONY L. DELUCA, PLC**

By:___/s/ Anthony DeLuca_____
     Anthony L. Deluca, Esq.
14950 East Jefferson Ave., Suite 170
Grosse Pointe Park, MI 48230
Tel:  (313) 821-5905
Fax: (313) 821-5906
anthony@aldplc.com

**FARUQI & FARUQI, LLP**
Juan E. Monteverde
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331